**SABRINA P. SHROFF**
ATTORNEY AT LAW

80 BROAD STREET
19TH FLOOR
NEW YORK, NEW YORK 10007
TELEPHONE: (646) 763-1490

July 13, 2022

**BY ECF**

Honorable Mary Kay Vyskocil
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Courtroom 18C
New York, New York 10007

**United States v. Erick Oleaga, 1:20-Cr-213 (MKV)**
**(Mr. Erick Oleaga's Sentencing Letter to the Court)**

Dear Judge Vyskocil:

Mr. Erick Oleaga, through counsel, respectfully submits this Sentencing Memorandum in support of his request for 48 months (four years) in prison, followed by three years of supervised release. Further, while in prison, Mr. Oleaga respectfully requests that he be placed into the Bureau of Prison's Residential Drug Abuse Program ("RDAP").[1]

Pursuant to a plea agreement, Mr. Oleaga has pled guilty to one count of conspiring to distribute and possessing with intent to distribute 28 grams of crack cocaine in violation of 21 U.S.C. 841(b)(1)(C). *See* Department of Probation Presentence Report ("PSR") ¶ 15. As discussed below, this results in a guideline sentencing range of 57-71 months, to be followed by three years of supervised release. The guidelines range, however, is both advisory and just one of multiple sentencing factors. Assessing them all, a sentence of 48 months in prison, concurrent with Mr. Oleaga' placement in RDAP, is sufficient, but not greater than necessary, to comply with the factors guiding federal sentencing.

Mr. Oleaga's downfall is keyed to his addictions. Raised in poverty and with no father or steady male role model in his life, and beset from an early age with acute attention deficit disorder (ADD) and crippling anxiety requiring medication, counseling, and support, Mr. Oleaga quickly turned as a young teenager to self-medicating with marijuana, Xanax, and Percocet and, in turn, to the male-centered affirmation offered by membership in the DTO gang. This led to a series of mostly petty, but some serious crimes, including the drug possession and distribution comprising the instant offense that Mr. Oleaga used to feed his own addiction and maintain his DTO standing. It was the only family he had, and Mr. Oleaga, given his anxiety and age did not make better choices.

---

[1] The RDAP is a voluntary, 500-hour, nine- to twelve-month program of individual and group therapy for federal prisoners with substance abuse problems. It is authorized by 18 U.S.C. § 3621, which directs the BOP to provide "residential substance abuse treatment (and make arrangements for appropriate aftercare) ... for all eligible prisoners." As an incentive to get prisoners to participate, federal law allows the BOP to reduce the sentences of RDAP graduates convicted of "nonviolent" offenses by up to one year. *See, e.g.,* https://www.bop.gov/inmates/fsa/docs/2021_fsa_program_guide.pdf. ("RDAP Guide") at 24; https://famm.org/wp-content/uploads/FAQ-Residential-Drug-Abuse-Program-5.3.pdf.

Hon. Hon. Mary Kay Vyskocil  July 13, 2021
Judge, United States District Court  Page 2

Despite this, there is still much potential to Mr. Oleaga. As the letter of support accompanying this memorandum attests, Mr. Oleaga is, at heart, a good man who has acquired some fiercely loyal friends who have agreed to guide Mr. Oleaga. Now aware of the depth of his addiction they are far more cognizant now than they were before. Chanel Jaquez and Mr. Edwards – the main family support for Mr. Oleaga are now acutely aware of what is needed. They have had several family meetings and agreed to step up to support Mr. Oleaga beat his addictions to become a good brother and son, and a constructive member of society. In turn, Mr. Oleaga is keenly interested in turning his life around by, among other things, participating in and completing the RDAP drug abuse treatment program while in prison. Mr. Oleaga has come to understand the toll his behavior has placed on himself, his mother, and his siblings. While a prior attempt failed, he is committed to ending his reliance on drugs and leading a law-abiding life.

For all these reasons, the Court should sentence Mr. Oleaga to 48 months (four years) in prison, together with drug treatment while incarcerated. Such a sentence, which is only nine months less than the sentence recommended by the Department of Probation, best accords with the parsimony principle that guides federal sentencing and is the proper and sufficient sentence for Mr. Oleaga.

## BACKGROUND

**Erick Oleaga**

Erick Oleaga is 24 years old and was born and grew up in various boroughs of the City of New York. PSR ¶ 72, 81. He is the result of a brief relationship between his mother, Migdonia Johanny Cespedes, and his father, Juan Leonel Oleaga. *Id.* ¶¶ 72, 74. Erick was raised exclusively by his mother, and he has no relationship or existing contact with his father. *Id.* 74, 80 (statement by family friend German Edwards confirming that Erick's father "was absent for most of [Erick's] life"). "[T]he absence of his father was, and continues to be, a source of his [Erick's] recurring depression and anxiety." *Id.* ¶ 87. Without a father or child support payments, the family – comprised of Erick, his mother, and two younger maternal half-siblings now age 12 – grew up in grinding poverty. His mother worked long hours as a home health aide, "but her income was not always enough to meet all of the household needs." *Id.* ¶¶ 73, 75.

With Erick's mother spending long hours at work, Erick was cared for by a babysitter, Rose Edwards, who lived in the building and watched him for free. PSR ¶ 75. Sadly, Ms. Edwards passed away on April 10, 2020, at age 92. *Id.* However, through Rosa, Erick met Rosa's nephew, German Edwards, and her great niece, Chanel Jaquez. Both George and Chanel have known Erick for his entire life, and probably know him best. They both strongly believe in Erick's innate goodness, and that, with help, including all the help they are willing to provide, Erick can be a productive and stable member of society. *See, e.g.,* Letter from Chanel Jaquez (attached hereto as **Exhibit A**); Letter from German Edwards (attached hereto as **Exhibit B**); PSR ¶¶ 79-80 (home visit and phone interview with German Edwards).

When Erick was in third grade, he was diagnosed with hyperactivity and attention deficit disorder (ADD). The affects of his disorder was severe; it resulted in his being placed in special education classes until high school, weekly or twice-weekly counseling sessions until high school, and being prescribed at least two types of psychotropic medication as part of his treatment plan.

Hon. Hon. Mary Kay Vyskocil  July 13, 2021
Judge, United States District Court  Page 3

PSR ¶ 85. While the special education classes, school-based counseling, and medical treatment ended upon his entry to high school, Erick continued to suffer from various mental and emotional issues, including ADD, depression, and crippling stress and anxiety. *Id.* ¶¶ 86-87. By the time he was 12, Erick had learned to self-medicate, first with daily marijuana use, and then by abusing prescription medication as well. *Id.* ¶¶ 88-89.

Unwilling as a teenager to acknowledge or address his abandonment by his father, and struggling at school because of his ADD and other emotional issues, Erick increasing began to increase his drug use and, by the time he reached high school, turned to the streets to find validation and support from other males he could not find at home. PSR ¶ 76. He joined a gang called DTO and became a member of a crew that worked together to sell crack in a certain subject area in The Bronx. *Id.* ¶¶ 23-24. While other members of the crew are accused of committing violent acts, the only firearms related charge against Mr. Oleaga related to the offensive conduct at issue involved his possession of a firearm, but not its use. *See, e.g., id.* ¶¶ 15(b), 27-30, 38.

Mr. Oleaga left school at the beginning of Twelfth Grade but has since obtained his GED. PSR ¶¶ 92-93.

## Mr. Oleaga's Drug Addictions

Just 24 years old, Mr. Oleaga has been high most of his life. PSR ¶¶ 88-89. At the age of 12, he began smoking marijuana daily. *Id.* ¶ 88. At age 17, he began regular use of non-prescribed prescription medications, first Xanax, and then Xanax and Percocet, as an additional way of trying to relieve his crippling levels of stress and anxiety. *Id.* This regular, daily drug abuse and addiction continued for 11 years, until his arrest in this matter in March 2020. As his lifelong friend, Chanel Jaquez laments:

> I have always been close to Erick. I was raised with him, and I know him better than most people. When he moved to the Bronx, I knew we had lost him as he was using drugs. He started to skip class, get into trouble with his peers, and stay out past his curfew. The lack of supervision and chaos at home led him astray and I believe that with the right amount of support he can choose a better path for himself.

Letter from Chanel Jaquez to Court (Ex. A).

Mr. Oleaga recognizes the destruction his addictions have caused and the necessity of ending those addictions. Indeed, he violated his pretrial release because of his continuing and overwhelming need to smoke weed. *See* PSR pp. 1 and 26. Notably, Erick has tried to free himself and reach sobriety before, attending and completing the Alcohol and Substance Abuse Treatment (ASAT) program offered by NYS DOCCS. *Id.* ¶ 89. While this first treatment attempt was not successful long-term, Mr. Oleaga recognizes that he must try again. In this regard, a 2019 national study of recovering adults determined that "the best estimate for the number of attempts needed for most people to resolve a significant substance problem is two." https://www.recoveryanswers.org/research-post/recovery-attempts-review/, citing to Kelly, J. F., Greene, M. C., Bergman, B. G., White, W. L., & Hoeppner, B. B. (2019). *How many recovery attempts does it take to successfully resolve an alcohol or drug problem? Estimates and correlates from a national study of recovering U.S. adults.* Alcoholism: Clinical and Experimental Research, 43(7), 1533-

1544. doi: 10.1111/acer.14067. Mr. Oleaga hopes that the Court will allow RDAP to be his second attempt at treatment, so he can successfully defeat his addictions and begin contributing positively to his family and larger community.

**Mr. Oleaga's Offense Conduct**

Mr. Oleaga's heavy, multiple addictions, while no excuse, helped him make the wrong decisions and choices in life, and contributed to his participation in the instant offense. "[Mr.] Oleaga was a DTO member who sold drugs" PSR ¶ 27. Specifically, during the course of the government's investigation, Mr. Oleaga was observed both cooking and selling crack cocaine, and he also provided evidence via social media that he had access to guns as part of DTO. *Id.* ¶¶ 27-30. The government calculates that, in the course of this offense, Mr. Oleaga was responsible for selling a total of $1,400 worth of crack cocaine. *Id.* ¶ 111.

It is important to note that Mr. Oleaga is the least culpable of the eight defendants in this case,[2] a fact the government recognized in uniquely allowing Mr. Oleaga to plead to a lesser included offense under 21 U.S.C. 841(b)(1)(C), thus avoiding the mandatory minimum of 60 months that would have resulted had he pled guilty to the 841(b)(1)(B) offense charged in Count Four of the superseding Indictment. *See* PSR ¶¶ 15, 101; PSR Sentencing Recommendation at p. 26.

The Department of Probation attempts to find an identity between the acts of Mr. Oleaga and his co-defendant, Khalil Suggs, contending that Oleaga and Suggs "are each responsible for distributing at least 28 grams, but less than 112 grams of crack. They also possessed firearms in connection with the offense." PSR ¶ 34. A closer look, however, shows that the government is wrong, and that Mr. Suggs actions are far more troubling and violent than those of Mr. Oleaga. Specifically,

> in November 2019 Suggs participated with another member of the DTO in threatening a suspected cooperating witness ("CI-1") who had been purchasing narcotics from members of the DTO, including Suggs. Suggs pretended to agree to sell CI-1 two firearms, and upon that pretext, lured CI-1 into the stairwell of a building within the DTO's turf. At that point, Florentino Garcia, the shooter who had killed Christopher Pierce the previous year, entered the stairwell, brandished a firearm at CI-1, took CI-1's money, and searched CI-1 for a wire in an effort to establish whether he was giving information about the DTO's drug-trafficking activity to law enforcement. Though the men did not find a wire, Suggs told Garcia to kill CI-1. At that point, movement in the stairwell on another floor spooked Suggs and Garcia, which allowed CI-1 to escape. (PSR ¶ 27).

8/3121 Govt. Sentencing Letter in *United States v. Khalil Suggs*, S1 20 Cr. 213 (MKV), ECF Docket No. 196, at pp. 1-2. In contrast to Mr. Suggs, Mr. Oleaga is not accused of terrorizing and

---

[2] For example, three of the defendants (Francis, Colon, and Azuna) are also charged with a Hobbs Act robbery that resulted in the death of a person. Plainly, what they did cannot properly or reasonably be compared to the drug offense for which Mr. Oleaga is charged. *Cf.* PSR ¶ 38 (stating that "[t]here are no identifiable victims in the offense involving the defendant [Mr. Oleaga]").

threatening to kill a man they suspected of cooperating with law enforcement. At most, he is accused of possessing, or claiming to possess, a firearm. *See* PSR ¶¶ 27-30.

**The Advisory Guidelines Calculation
and Probation's Recommended Sentence**

The government calculates the guidelines range based on a total offense level of 23 (which includes a two-level increase for possessing a firearm), and a criminal history category of III (mostly petit larcenies). PSR ¶¶ 15, 41-65. Taken together, this results in an advisory guidelines range of 57 to 71 months in prison. *Id.* ¶ 100. The Department of Probation recommends that the Court impose a guidelines sentence of 57 months in prison, followed by three years of supervised release. PSR at p. 27 (Sentencing Recommendation). In doing so, Probation recognized Mr. Oleaga's lack of a father and resulting emotional and educational struggles (*id.* at p. 25), and also recommends that Mr. Oleaga be required to participate in "mental health treatment … since he reportedly from ADD and anxiety [and t]his special condition should assist the defendant in reducing his risk of recidivism" (*id.* at p. 26).

**Mr. Oleaga's Time in Prison and
His Future Plans Upon Being Released**

Mr. Oleaga was remanded to Essex County Correctional Facility ("Essex") on August 14, 2020. Thus, the 22 months of his incarceration has taken place during the height of the COVID-19 pandemic. During his time there, regular and severe lockdowns became commonplace, and all services and visits were wholly or partially suspended.

Adding to the chaos was the rapid spread of COVID throughout the prison system in general and Essex in particular. In announcing the closure of in-person visits in late December 2021, Essex reported that 101 officers and 28 inmates had tested positive.[3]

Moreover, as conditions deteriorated, fear, and the real possibility, of injury and death at Essex increased exponentially. Essex inmates keep hearing of inmates dying due to the absence and/or negligence of the correctional staff. As a New York Times story summarized, in just a few months at Essex, one inmate was stabbed to death and another was subjected to a prolonged, vicious attack by other inmates that was not interrupted by corrections officers for several minutes, during which the victim was attacked with stomps, fists, a microwave, a water cooler, a broom, and an industrial bucket filled with bleach, leaving the victim in a coma for more than two months.[4]

In those 22 months of chaos, Mr. Oleaga only has received two incident reports. On December 15, 2020, he verbally threatened a correctional officer. PSR ¶ 19. Eighteen months later, on June 12, 2022, Mr. Oleaga is said to have engaged in a physical altercation with another inmate.

---

[3] S. Rodas, "N.J. jail to pause in-person and attorney visits due to COVID surge," N.J. Advance (Dec. 24, 2021) *available at* https://www.nj.com/coronavirus/2021/12/nj-jail-to-pause-in-person-and-attorney-visits-dueto-covid-surge.html.

[4] T. Tully, "He Went to Jail on Minor Charges. He Left in a Coma," N.Y. Times (Dec. 28, 2021), *available at* www.nytimes.com/2021/12/28/nyregion/prison-fight-beating-jayshawn-boyd.html.

Hon. Hon. Mary Kay Vyskocil                                                                July 13, 2021
Judge, United States District Court                                                             Page 6

As to this latter incident, the report is silent on the other inmate's repeated theft of Mr. Oleaga's lunch, which Mr. Oleaga's family paid for and are provided to those incarcerated at Essex County in take-away boxes. Also omitted from the incident report is the other inmate's conduct that preceded the reported conduct. While nothing excuses the actions of the two young men, it must be emphasized that the incident did not involve any weapons of any kind. Even according to the incident report, Mr. Oleaga and the other inmate engaged in a fistfight and the other inmate "did not receive any injuries" during the incident. *See* 6/12/2022 Incident Report at p. 2 (attached hereto as **Exhibit C**). These two isolated incidents many months apart, however, do not make a longer prison sentence appropriate. Nor does it show propensity. Instead, it shows Mr. Oleaga should receive the counseling, addiction treatment and support all of which he needs, both during his time in prison and thereafter.  He would greatly benefit from the RDAP program and we respectfully request the Court to recommend that the Bureau of Prisons consider allowing him to participate in the program.

   Prior to his incarceration at Essex, Mr. Oleaga was employed as a laborer and forklift operator by Parallel Products, via an employment referral from Hire Point LLC, a staffing agency. He worked at Parallel Products from November 2019 until August 2020. PSR ¶¶ 95-96. His friend, Chanel Jaquez helped him obtain his job at Hire Point LLC and Parallel Products by working with Mr. Oleaga on his resume, and she intends to assist him again in finding a job upon completion of his prison term. *See* Letter from Chanel Jaquez to Court (Ex. A). Indeed, she and her uncle, German Edwards. Intend to do whatever is necessary to ensure that Mr. Oleaga stays off drugs and becomes a fully functional and law-abiding person. As Chanel tells the Court:

> When Erick is released from jail, I intend to be incredibly involved and supportive of his efforts. I know that he will be on supervised release, and I will make sure that he stays in treatment for both drugs and management of his anxiety and anger. As I did in the past, I intend to assist him by re-drafting his resume (I did that before he was incarcerated), which in that past has successfully landed him a job at Hire Point Staffing Solutions LLC, where he held a position from March 2021 to August 2021.
>
> I am planning to make sure that I (and German) are present for him, and we will do all we can to make his transition easier. I will help him with food, accompany him to appointments, and make sure that he works on both his addiction and his anger.
>
> I used to work in a nursing home but am not working right now. If you have any questions, please contact me at 1(646)943-1304 or by email at the above mentioned.
>
> Thank you for taking the time to read this letter. I know that Erick is not the easiest person, but I can assure you that he has a good heart and that both my uncle and I are very invested in helping him.

*Id.* (Ex. A). Chanel's belief in Erick's ability to rehabilitate is echoed by her uncle, German Edwards. Mr. Edwards believes Mr. Oleaga can reform and succeed if given the right opportunities. PSR ¶ 80. As part of this, Mr. Edwards has agreed to allow Erick to reside with him during any imposed period of supervision. *Id.*

> I love my nephew and I know that he will need support. I plan to support my nephew financially as he transitions back to the community. Before he was incarcerated, I supported him by offering him a room in my apartment at 720 W 172nd St Apt 4E

> New York, NY 10034 and will continue to offer this room to him. Additionally, I will be helping him find employment as I have over 20 years of experience in construction work as a laborer, I can assist him with this process as well.

Letter from German Edwards (Ex. B). On June 23, 2020, Pretrial Services conducted a home visit of Mr. Edwards' Manhattan apartment and found it clean and well-furnished. PSR ¶ 79.

Plainly, Mr. Oleaga has good and supportive friends who are invested in his success upon release from incarceration. As discussed below, this support system is one reason to sentence Mr. Oleaga to 48 months requested by him.

## ARGUMENT

### A.    The Legal Standards for Sentencing

In selecting a sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). That provision directs sentencing courts to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," i.e., "proportionality, deterrence, incapacitation, and rehabilitation." *Id.; see also, e.g., Pepper v. United States*, 562 U.S. 476, 493 (2011); *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

In determining such a sentence, the sentencing court must consider the United States Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. *Id.* § 3661.

While the sentencing guidelines comprise one factor for this Court to consider, they are only one such factor, and "truly are advisory.'" *Douglas*, 713 F.3d at 700 (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)). This Court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also Nelson v. United States*, 555 U.S. 350, 352 (2009). Here, an individualized assessment of the § 3553(a) factors (and application of the parsimony clause) support the requested sentence of four years (48 months) imprisonment, followed by three years of supervised release.

### B.    The § 3553(a) Factors Strongly Support a Non-Guidelines Sentence of 48 Months

As detailed above, Mr. Oleaga's personal characteristics and history support the requested sentence. It is evident that Mr. Oleaga is trying his best but is still captive to the abandonment he suffered as a child and the resulting emotional issues and drug addictions. *See* PSR ¶¶ 74-75, 87-91, As German Edwards, who has known Mr. Oleaga nearly his entire life, so aptly put it: "Oleaga

Hon. Hon. Mary Kay Vyskocil                                                                                         July 13, 2021
Judge, United States District Court                                                                     Page 8

is 'not a bad kid,' just an individual who has never had a mentor in his life" and simply "'needs opportunities' to succeed." PSR ¶ 80. Placing him in the nine-to-twelve-month intensive RDAP program while he is incarcerated (*see* PSR ¶ 91, requesting placement in RDAP) is the appropriate solution here, and dovetails with the sentencing goal of providing a defendant with needed educational or vocational training, medical care, or other treatment in the most effective manner. 18 U.S.C. 3553(a)(2).

Forty-eight months also properly recognizes the nature and circumstances of the instant offense. Four years in prison, which is just nine months below the advisory guidelines sentencing range, *plus* three additional years of supervised release as advised by the guidelines, "is not merely 'letting an offender off easily.'" *Gall v. United States*, 552 U.S. 38 (2007). As the United States Supreme Court expressly has recognized, supervised release involves "substantial restrictions on freedom" that effectively deters and punishes in its own right. *Id.*

The sentencing goals of specific and general deterrence, and rehabilitation, also support the requested non-guidelines sentence. As to specific deterrence and rehabilitation, Mr. Oleaga's timely plea and acceptance of responsibility for his actions demonstrates his commitment to changing his ways. He will be supported in that effort by Mr. German Edwards and Chanel Jaquez, who, together with Mr. Oleaga's mother, are the only long-term and positive influences in Mr. Oleaga's life. As before, these two have offered to provide Mr. Oleaga with a place to live; help overcoming his drug addictions and maintaining his sobriety; help him find employment; and anything else required to ensure his return to society is successful. *See* Ex. A (Letter from Ms. Jaquez to the Court); PSR ¶¶ 79-80. In any event, Congress has recognized that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a) (emphasis added). Here, that correction and rehabilitation can best be addressed not by adding additional months to his sentence, but by making sure that Mr. Oleaga receives the substance abuse treatment he needs while in prison, so he can successfully return to society after serving a sufficient sentence that is no greater than necessary.

In addition to specific deterrence, the requested sentence of 48 months will generally deter others who are considering making the same mistake as Mr. Oleaga. Studies have shown that it is the arrest that best deters, not the length of the sentence. *See, e.g.,* Valerie Wright, The Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment, 5-6 (2010), http://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf. Here, Mr. Oleaga's younger siblings, neighbors, and associates already have seen him arrested and incarcerated for almost two years. Under these circumstances, the additional nine months of prison time recommended by Probation – 57 months (4 years, 9 months), as opposed to the 48 months (4 years) requested by Mr. Oleaga – will not provide any greater specific or general deterrence. Accordingly, the parsimony principle underlying federal sentencing supports the 48 month sentence, because it is sufficient, but not greater than necessary to meet each of the foregoing sentencing goals.

Finally, even in "normal" times, courts in this District have acknowledged that "it is no small thing to deprive a person of his or her freedom" because prison "is a harsh environment, in which fear and misery are never far from the surface, boredom is endemic, and privacy is nil." *United States v. Sayoc*, 388 F. Supp. 3d 300, 301 (S.D.N.Y. 2019). But, as discussed above, the months spent by Mr. Oleaga at Essex during the COVID-19 pandemic has been anything but

Hon. Hon. Mary Kay Vyskocil  July 13, 2021
Judge, United States District Court  Page 9

normal. Instead, Mr. Oleaga has been forced to live through a prison system descended into unexpected and terrible chaos.

Many judges have not hesitated to grant downward variances to defendants who have suffered through pandemic-era detention in recognition of the obvious: that each day they have served has been more punitive than a normal day in jail and more punitive than was ever intended. As Judge Rakoff put it: "[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons." *United States v. Cirino*, 19 Cr. 323 (JSR) (July 17, 2020); *see also United States v. Diaz*, 20 Cr. 305 (DLC), Dkt. No. 52 (Feb. 25, 2021) (recognizing the "circumstances…[of] incarcerat[ion] are harsh and unusual because of the pandemic. I am going to take that into account in determining what sentence to impose."); *United States v. Garcia*, 20 Cr. 27 (JGK) (Jul. 10, 2020) (explaining that "imprisonment contemplated by the guidelines would be imprisonment under normal circumstances, but [pandemic-era] imprisonment has been anything but normal circumstances."). This Court should do the same here. The many months of terrible COVID-19 created prison conditions Mr. Oleaga has lived through provides another strong reason for imposing a sentence nine months shorter than the 57 month guidelines sentence recommended by Probation.

## CONCLUSION

An individualized assessment of the § 3553(a) factors in this case (and the parsimony principle) strongly support a sentence of 48 months incarceration, an additional 36 months of supervised release, and Mr. Oleaga's placement in RDAP. Mr. Oleaga respectfully requests that the Court impose that sentence upon him.

Respectfully submitted,

*/s/* Sabrina P. Shroff
Counsel to Mr. Erick Oleaga

Cc: Erick Oleaga